NOTICE

Decision filed 01/29/24. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2024 IL App (5th) 230652-U

NO. 5-23-0652

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| *In re* ALEXIS S., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Edgar County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 20-JA-8 |
| | ) | |
| Jessica S., | ) | Honorable |
| | ) | Matthew L. Sullivan, |
| Respondent-Appellant). | ) | Judge, presiding. |

JUSTICE McHANEY delivered the judgment of the court.
Presiding Justice Vaughan and Justice Boie concurred in the judgment.

**ORDER**

¶ 1    *Held:*   Where the trial court's orders finding that Jessica S. was an unfit parent and that the best interest of the minor child warranted termination of her parental rights were not contrary to the manifest weight of the evidence, we affirm the orders.

¶ 2    Jessica S. (Jessica) is the mother of a girl, Alexis S. (Alexis).[1] The Department of Children and Family Services (DCFS) was involved with Jessica and Alexis with an intact family services

---

[1] At the time of this DCFS case, Jessica was also the mother of an older girl and a younger boy, Cole W. The unnamed older daughter is not the subject of a DCFS case, and she lives with her biological father. Although Alexis and Cole were both removed from Jessica's home at the same time, only Alexis is involved in this case. DNA testing confirmed that Douglas Q. was the biological father of Cole, and he has been working a service plan to have Cole returned to him. On May 1, 2023, Jessica's parental rights to Cole were terminated. Cole's case is not included in this appeal. In addition, Jessica gave birth to another boy, Kaiden H., in May 2022. During that pregnancy, Jessica tested positive for methamphetamine, and upon his birth, DCFS opened a separate case for this child and removed him from Jessica's home. Kaiden's case is also not part of this appeal.

1

program case. Due to Jessica's lack of progress/success in this intact family case, and because of concerning reported issues involving Jessica's substance abuse, unsanitary housing conditions, and suspected injuries to Alexis's younger brother, Cole W., DCFS removed Alexis and Cole from Jessica's care in late May 2020. Both the State and Jessica filed numerous motions to continue the adjudicatory hearing, which was not held until April 6, 2021. Due to Jessica's failure to maintain a reasonable degree of interest, concern, or responsibility for Alexis and failure to make reasonable efforts and/or progress towards the return of Alexis to her care, the State filed its motion to terminate her parental rights. After the trial court found that Jessica was an unfit parent, the court concluded that it was in Alexis's best interest to terminate her parental rights. On appeal, Jessica contends that because the State did not comply with the statutory timeline for holding the adjudicatory hearing, the adjudicatory order must be dismissed without prejudice. Jessica also appeals the court's orders that she was an unfit parent and that Alexis's best interest required the termination of her parental rights.

¶ 3                                    I. BACKGROUND

¶ 4      Alexis was born on March 17, 2016. Her biological father was alleged to be Eric C.[2] The trial court terminated his parental rights to Alexis on May 1, 2023. Based upon various reports in the record, DCFS was working with One Hope United and its caseworkers to coordinate services in this case. Before the State filed its petition for adjudication of wardship in Edgar County circuit court on May 26, 2020, DCFS had instigated an intact family services case. A "reporter" made three reports involving "concerning" behaviors and conditions. On April 18, 2020, the reporter stated that Jessica was a known methamphetamine user and had used drugs in the presence of Alexis. The reporter also stated that Alexis had been left outside and unsupervised, which resulted

_____

[2]Eric C. never completed a DNA test to verify paternity and is not part of this appeal.

2

in the local police being called on several occasions. In addition, the reporter stated that the home was not in good shape with holes in the walls and the presence of mold on the floors. Then on May 8, 2020, the reporter saw Jessica use methamphetamine in front of Alexis. The reporter also saw Jessica blow smoke, of unknown origin, into Alexis's face, and noted that the home was always "full of smoke." Additionally, the reporter indicated that Jessica frequently yelled at Alexis. On May 22, 2020, the reporter found maggots and flies around food sitting on counters in the home, and trash was piled up throughout the home. The reporter also commented that Alexis was unclean and needed a bath.[3]

¶ 5       On May 26, 2020, the Stated filed its petition for adjudication of wardship stating that Alexis was neglected, abused, or dependent on the basis that Jessica had a history of substance abuse and had tested positive for methamphetamine on January 8, 2020; Jessica had not provided a safe and adequate environment as Alexis had been seen sitting on a second story windowsill with the window open and had also been allowed outside the home without supervision; the home environment was also not safe and adequate because it was littered with trash and cigarette butts; and Al's younger brother had unexplained burns and bruises, an unexplained leg fracture, and a diagnosis of failure to thrive. 705 ILCS 405/2-3, 2-4 (West 2020). The trial court granted the

---

[3]The record on appeal contains information about numerous DCFS "indicated" findings for substantial risk of physical injury/environment injurious to the health and welfare of Alexis S. and her younger brother. The "indicated" findings were the result of investigations involving Jessica and her children. The dates of the indicated findings are the dates when the investigations were concluded and do not necessarily match up with dates when DCFS witnessed or received reports about the conditions and/or injuries. Thus, the dates of the findings are both before and after the removal of the children from the home in this case. The dates of the seven "indicated" findings are: April 12, 2019—substantial risk of physical injury/environment injurious to health and welfare by neglect and environmental neglect; June 21, 2019—burns by neglect and substantial risk of physical injury/environment injurious to health and welfare by neglect; February 11, 2020—environmental neglect and substantial risk of physical injury/environment injurious to health and welfare by neglect; March 6, 2020—substantial risk of physical injury/environment injurious to health and welfare by neglect; June 15, 2020—inadequate supervision; July 2, 2020—substantial risk of physical injury/environment injurious to health and welfare by neglect; July 7, 2020—cuts, bruises, welts, abrasions, and oral injuries.

State's petition for adjudication of wardship finding that the State established probable cause that there was an immediate and urgent necessity to remove Alexis from the home, that reasonable efforts to keep Alexis in the home did not eliminate the necessity of removing Alexis from that home and placed Alexis in the temporary custody of DCFS.

¶ 6    On June 2, 2020, Jessica made her first appearance in court with an attorney. The trial court set the adjudicatory hearing for July 28, 2020.

¶ 7    On the date of the scheduled July 28, 2020, adjudicatory hearing, the State filed its motion to continue because the State's witnesses had not yet been served with subpoenas, Alexis's father needed to receive notice of the hearing, and medical records had been received but not certified for introduction into evidence. The court noted that Jessica and Eric C., Alexis's purported father, were present in court, as well as Jessica's attorney. During the hearing, Eric C. asked about a DNA test. The trial court asked Jessica's attorney if he had any objection to continuing the adjudicatory hearing. Jessica's attorney stated that he had no objections to the continuance suggesting that the court should wait until the DNA test results were done. When asked how long it would take for the DNA results to be available, the DCFS representative approximated six to eight weeks. The court continued the adjudicatory hearing to September 22, 2020. The record contains no written order, and the transcript indicates that the trial court made no specific factual findings on the record about "good cause" being shown for the continuance or that the continuance was consistent with the health, safety, and best interests of the minor. *Id.* § 2-14(c).

¶ 8    On September 16, 2020, attorney Daniel Arbogast entered his appearance on behalf of Jessica. The following day he filed a motion to continue the adjudicatory hearing, asking the court for more time to review the case, consult with Jessica, interview witnesses, and pursue any needed discovery.

4

¶ 9    On September 22, 2020, the trial court held a hearing in this case. As of that date, Eric C. had not shown for two scheduled appointments for his DNA test. The DCFS representative stated that if Eric C. appeared at the third appointment for the test, results would likely be back in late November. The trial court initially planned to set the adjudicatory hearing for November 22, 2020, but noted that if the DNA results were available, Eric C. still would not have counsel appointed. The court suggested that November 22, 2020, should be used as a status hearing instead of the adjudicatory hearing. The trial court specifically asked Jessica and her attorney if they had any objections to postponing the adjudicatory hearing until after the November 22, 2020, status hearing, and attorney Arbogast said no. The trial court granted Jessica's previously filed motion for a continuance and set the next status hearing for November 22, 2020.

¶ 10    DCFS, through its agency One Hope United, interviewed Jessica and determined what services she required. At the time of the interview, Jessica was 31. She reported six years of sexual abuse as a child. The perpetrator was a maternal uncle. Jessica also reported a history of domestic violence in her personal relationships. Jessica acknowledged that she frequently used marijuana, and admitted to a past unspecified addiction, but stated that she stopped using drugs seven years ago when she became pregnant. She reported that her father was a methamphetamine addict who overdosed and died, and that her brother is also a methamphetamine addict. Additionally, Jessica reported that she has a family history of mental health issues. She reported that she was being treated by a physician for depression and anxiety and the doctor prescribed medications for those conditions. Jessica informed DCFS that she did not believe she needed substance abuse services, because she had "passed" all drug tests since the "date of the incident." DCFS determined that Jessica needed to have substance abuse treatment, individual mental health therapy, and parenting education and coaching.

¶ 11    On November 24, 2020, the trial court held a status hearing. Jessica was not present, and her attorney advised that she was quarantined due to alleged exposure to COVID-19. The trial court asked Jessica's attorney if she was seeking a continuance. Attorney Arbogast confirmed that he was asking for the continuance and suggested that the next court date of January 5, 2021, should also be just a status hearing instead of the adjudicatory hearing. The State concurred in that decision.

¶ 12    On January 5, 2021, the trial court called the case for the scheduled status hearing. Jessica was reportedly in a hospital. The record does not contain a transcript of the hearing, but the court noted that the case was continued to January 26, 2021, for a status hearing.

¶ 13    On January 26, 2021, Jessica was present in court with her attorney. The record does not contain a transcript of this hearing. The record shows that the court continued the case to March 2, 2021, on which date the adjudicatory hearing was set.

¶ 14    On March 2, 2021, the State filed its motion to continue the adjudicatory hearing. There is no written motion in the record on appeal. There is also no transcript of the hearing in the record. However, the court noted that it granted the motion "without objection" and continued the adjudicatory hearing to April 6, 2021.

¶ 15    On April 6, 2021, the trial court held the adjudicatory hearing. The State called two witnesses to testify.

¶ 16    The State first called Melissa Eldred, a child protection investigator employed by DCFS. She testified that she has been involved in several investigations involving Jessica and Alexis. She stated that Alexis is currently five years old, and her younger brother is currently three years old. She confirmed that on May 22, 2020, DCFS received a telephone call about the family, and she was assigned to investigate. She initially spoke with three individuals, and then went to Jessica's

6

apartment accompanied by a police officer. Jessica allowed Eldred to enter her home. Eldred testified that from her vantage point near the front door of the apartment, she could see trash piled up in multiple locations, plus a board with either nails or staples sticking out of it. She witnessed the younger child slip and fall on a discarded frozen pizza cardboard circle. Eldred testified that both children's feet and faces were quite dirty. An unknown female was sleeping on the sofa. The police officer attempted to wake the female but was unsuccessful. Eldred removed the children from the home, placed them in DCFS protective custody, and transported them to a local hospital. The male child had multiple bruises on his forehead, chest, upper thigh, and behind a knee. Eldred testified that following a February 2019 report that was ultimately found to be "indicated," DCFS instituted an intact family case for Jessica. At that time, DCFS had concerns about Jessica's mental health as she was engaged in self-mutilating behaviors. Additionally, Jessica tested positive for methamphetamine. The intact family case was designed to assist Jessica with substance abuse treatment and mental health counseling. Eldred testified that Jessica was the subject of another indicated report in May 2019 that involved burn injuries and an environment injurious to health. Finally, Eldred testified that there were two other indicated reports in December 2019 and January 2020 involving an environment injurious to health before DCFS took the children into protective custody.

¶ 17    On cross-examination, Eldred testified that there had been unfounded calls about Jessica and the children. She testified that the children's pediatrician did not make any report of child abuse and that DCFS did not know how Cole received the burn injury, which was from a cigarette.

¶ 18    The State next called William Griffin, who testified that he performs general repair work for Quality Housing, the company that owns the apartment complex where Jessica and the children lived. On May 22, 2020, Griffin investigated water damage in the apartment directly below

7

Jessica's apartment. Thereafter, he went to Jessica's apartment to investigate the source of the water. Upon entering the apartment, he noticed trash piled up in all corners, a lot of damage to the apartment walls, and water and dirty diapers covering the bathroom floor, which was the source of the leak into the apartment below. In one area, he said that the storm screen door could not be opened because of the trash that was thrown in that vicinity. He stated that he and a lady named Ruby, who was with him in the apartment, took photographs. He identified the photographs of Jessica's apartment taken on that date. He also testified that approximately two months earlier, he and Ruby were inside Jessica's apartment, and while there were issues of trash and damage to the walls, the amount of trash was not as significant as witnessed on May 22, 2020.

¶ 19    On cross-examination, Griffin testified that in examining the bathtub in the apartment, he determined that someone had dismantled the drain overflow in the bathtub, which resulted in the flooding in the downstairs apartment. He confirmed that Jessica's children were present in the apartment on May 22, 2020.

¶ 20    The State next called Ruby Floyd, who testified that she was employed by Quality Housing as a property manager. She testified that she and Griffin entered Jessica's apartment on May 22, 2020, to investigate a water leak. She testified that Jessica's children were present. In addition, a Morgan's Plumbing representative was also present. Floyd testified that upon entering the apartment, she noticed trash and clothes "everywhere," and maggots and many flies in the kitchen. Floyd testified that someone had changed the locks on Jessica's door because when she had attempted to do a recent inspection of the apartment, the Quality Housing key for Jessica's apartment would not work.

¶ 21    On cross-examination, Floyd stated that she had notified all tenants of the intent to perform an inspection of the apartments by taping notices of the inspection to each apartment door. Floyd

8

testified that the notice was no longer on Jessica's door, but she was not able to access the apartment because Jessica did not answer the door, and Quality Housing's key did not work. Floyd testified that Jessica had told her that her apartment had been broken into several times. Floyd stated that she had requested police reports, but Jessica had never provided them. Floyd denied any knowledge that Jessica had requested repairs to the bathtub prior to May 22, 2020.

¶ 22    Jessica next testified at the adjudicatory hearing. She stated that on May 22, 2020, she was cleaning the apartment. Trash had been swept up into a pile, and garbage bags containing used clothing and toys were ready for donation. Other trash bags were full, but she had not taken them out to the dumpster because when she had done so in the past, people had reported her for leaving her children in the apartment alone. She stated that the issue with the bathtub was not of recent origin. The previous handyman had removed the part in question and never returned to replace it. Moreover, she testified that she had made numerous complaints about the bathtub requiring repairs.

¶ 23    Jessica also testified about her son's injuries. She had no idea how he sustained a cigarette burn but stated that he had been staying with her mother. She also testified that his other bruises were present after another stay at her mother's home in Iowa. Jessica testified that there had been numerous unfounded DCFS complaints about her care of the children. She also testified that her apartment had been broken into several times, and that the offenders "trashed" her apartment. She testified that her next-door neighbor was one of the burglars and was caught in the apartment, but that the police advised that they were not investigating or charging people for home invasions during the COVID-19 pandemic. Jessica also denied the allegation that her children had been in an open window of her apartment. She testified that there was one time when the windows were replaced, but her children were not there at the time.

¶ 24    On cross-examination, Jessica testified that the children had previously been at her mother's home because she had signed over custody to her mother. However, when her mother indicated that she could no longer care for Jessica's children, they came back to Jessica's home. Upon arriving home, she noticed that her son was bruised and had a black eye. The children returned to her home approximately two weeks before May 22, 2020, when the children were removed by DCFS. She testified that she smokes cigarettes, but only in her bedroom.

¶ 25    At the conclusion of the hearing, the State withdrew the allegation involving Jessica's history of substance abuse. The trial court found that the State had established two of the three allegations, paragraphs B and C—mother is unable to provide a safe and adequate environment for the minors in that the home was littered with trash and debris, and cigarette butts were in the children's reach; and environment injurious to the welfare of the children in that Alexis's sibling had unexplained injuries, including burns and bruising. The trial court set the dispositional hearing for May 25, 2021.

¶ 26    On May 20, 2021, DCFS filed its dispositional report, which recommended a permanency goal of return home within 12 months. The most recent service plan was dated May 11, 2021. DCFS maintained its service recommendations including substance abuse treatment, individual therapy, parenting education and coaching, and cooperation with the agency. DCFS reported that Jessica was sporadic with visitation due to a variety of reasons including multiple alleged COVID-19 infections, failing to confirm her scheduled visit as mandated, alleged spider bites, attendance at "treatment," moving to Terre Haute, Indiana, with a boyfriend having no transportation for visitation, and involvement with a friend who overdosed. In addition to attendance issues, DCFS noted that Jessica made "empty promises" to the children, tried to speak to the foster support specialist about case-related matters, and told the children stories about why they were not allowed

10

to return to her apartment, including that the door was kicked in, the plumbing was not working, or that she had a friend in the home. Overall, the caseworker indicated that the prognosis for returning the children home was poor as Jessica continued to significantly minimalize and deny the risk factors that impacted the safety of the children, and Jessica continued to use "illicit substances." DCFS noted that substance abuse and mental health concerns were chronic, and Jessica was resistant to treatment. DCFS also had ongoing concerns with the home environment and housing that Jessica would be able to provide for the children. DCFS asked the trial court to find that Jessica was unfit or unable for reasons other than financial circumstances alone to care for, protect, train, or discipline the minors or is unwilling to do so.

¶ 27    Jessica's attorney filed a motion to continue the dispositional hearing on May 20, 2021, alleging that she was seeking treatment for her "mental health and wellbeing." On May 25, 2021, the court held a hearing, and noted that Jessica was in inpatient care at Hour House.[4] The court continued the dispositional hearing until July 6, 2021.

¶ 28    On July 6, 2021, the trial court called the case for hearing. Jessica's attorney stated that Jessica was "in treatment." The record is not clear who asked for the continuance of the dispositional hearing, but the trial court continued it to August 3, 2021.

¶ 29    On August 3, 2021, the State informed the trial court that it was not ready to proceed because the agency employee assigned to this case discontinued employment on July 31, 2021, and thus no subpoena for the current employee assigned to the file had been issued. Jessica's attorney indicated that he had no objection to a continuance but stated that he would like the next hearing date to be more than one month later because Jessica was having "dual treatment" at

---

[4]Hour House is a substance abuse residential treatment facility in Charleston.

11

Bloomington Meadows Hospital. The trial court continued the dispositional hearing to October 5, 2021.

¶ 30    Prior to the hearing date, on September 22, 2021, Jessica's attorney filed a motion seeking a continuance because he had suffered a cardiac event on September 13, 2021, and had surgery, and was still experiencing fatigue and other symptoms. On October 5, 2021, Jessica was present in court, but her attorney was not. Another attorney was appointed to represent Jessica in her attorney's absence. The trial court continued the dispositional hearing to November 2, 2021.

¶ 31    On October 4, 2021, DCFS filed its dispositional addendum report. The report indicated that Jessica was in Hour House for substance abuse treatment from May 22, 2021, until May 25, 2021, when she left against medical advice. From June 1, 2021, until September 19, 2021, Jessica missed most of her scheduled visits with Alexis. On August 11, 2021, the caseworker contacted Horizon Health to inquire about whether Jessica had presented for drug screens. Horizon Health stated that the last drug test Jessica had was on January 1, 2021, and she tested positive for methamphetamine. As time passed, DCFS found that Jessica's behavior became increasingly erratic and "explosive," and thus it was determined that Jessica could not have visitation with her children until she had three consecutive directly-observed negative drug screens. On September 23, 2021, Jessica contacted her caseworker's supervisor and requested the assignment of a different caseworker. When advised that this was not permissible, Jessica informed the supervisor that her request was because she had completed all services and did not understand why her children were still in care. Overall, DCFS noted that Jessica "continues to present with significant minimization and denial surrounding risk factors that impact her children's safety and has continued to use illicit substances."

12

¶ 32    On October 28, 2021, Jessica, through her attorney, asked the trial court to continue the November 2, 2021, dispositional hearing because counsel continued to have cardiac-related issues, and because Jessica had been exposed to COVID-19, although she had not yet received test results confirming a diagnosis.

¶ 33    On November 2, 2021, Jessica's substitute appointed attorney was present, but Jessica failed to appear. Her substitute attorney advised the court that he had no documentation that Jessica was ill other than that she allegedly texted him a photo taken of her on October 31, 2021, from a physician's office. The attorney confirmed he had no medical documentation about her condition that would support her failure to appear in court. The trial court noted that it had "no record of positive covid test for mother." The State objected to a continuance. The court denied the October 28, 2021, written motion for a continuance and proceeded with the dispositional hearing. The court then adopted recommendations DCFS made in its dispositional report. On November 4, 2021, a dispositional order was entered by the trial court finding that Jessica was "unfit or unable for reasons other than financial circumstances alone to care for, protect, train, or discipline the minor or is unwilling to do so." The court found that Alexis was neglected and granted guardianship and custody of Alexis to DCFS.

¶ 34    On December 2, 2021, Jessica, through her attorney Arbogast, filed a motion to vacate the dispositional order. On February 22, 2022, the trial court granted Jessica's motion to vacate the November 4, 2021, dispositional order and set the case for a status hearing on March 29, 2022. On that date, the court continued the case to May 24, 2022, at which time the dispositional hearing was scheduled.

¶ 35    On May 24, 2022, Jessica's attorney filed a motion to continue, alleging an inability to obtain discovery from the State, his own ongoing health issues, and Jessica's recent delivery of a

13

baby. The trial court found that the motion was untimely and denied it. The State called two witnesses.

¶ 36 Elizabeth Shafer, a former employee of One Hope United, and current employee of Addus, testified that she was assigned to this case by One Hope United as a foster care case manager. She was employed in that capacity from September 2019 until July 2021. Shafer stated that she prepared the dispositional report. Jessica was required to complete services involving substance abuse, individual therapy, and parenting. She testified that she met with Jessica a couple of times, but that contacting Jessica via phone calls and/or text messages was difficult because Jessica's telephone number frequently changed. Shafer testified that she believed at one point Jessica was engaged in services related to substance abuse, but that Jessica never completed services during her tenure on the case. She testified that Jessica's visitation attendance was sporadic. Shafer stated that she knew that Jessica entered inpatient substance abuse treatment but checked herself out against medical advice. In addition, she testified that Jessica refused random drug tests.

¶ 37 The State also called Kelly Dick, then employed as a training specialist for One Hope United. She previously worked as a case manager at One Hope United from 2019 until January 7, 2022. Dick was assigned to this case from August 2021 until January 7, 2022. As case manager, Dick reviewed all records to ascertain the service recommendations for Jessica. Dick never had an in-person meeting with Jessica but spoke to her by telephone. She also testified that Jessica had several different telephone numbers which made contact difficult. Dick's supervisor unsuccessfully attempted to set up child and family team meetings with Jessica, but she refused to cooperate. At one point, Jessica blocked Dick's phone number. Dick testified that from August 2021 until January 7, 2022, Jessica engaged in no services and refused all required random drug

14

tests. On cross-examination, Dick acknowledged that she never visited/inspected Jessica's apartment because she "could never get ahold" of her.

¶ 38    At the conclusion of the hearing, the trial court found that Jessica had not made reasonable and substantial progress or efforts toward the return of Alexis. The court then adopted the findings and recommendations in DCFS's dispositional report and placed guardianship of Alexis with DCFS.

¶ 39    On November 21, 2022, DCFS filed its permanency report. As of the date of the report, Jessica had failed to engage in any services, had not presented for scheduled random drug tests, and only had sporadic visits with Alexis. Alexis refused to attend two visits in September 2022, and there had been no visits between Jessica and Alexis since September 29, 2022. DCFS asked the court to modify the permanency goal from reunification within 12 months to substitute care pending the court's determination of whether Jessica's parental rights should be terminated.

¶ 40    On January 24, 2023, the State filed its motion to terminate Jessica's parental rights, which was served upon Jessica and her attorney in court. To support its claim that Jessica was unfit, the State made three allegations: (1) that she failed to maintain a reasonable degree of interest, concern, or responsibility as to Alexis's welfare (750 ILCS 50/1(D)(b) (West 2020)); (2) that she failed to make reasonable efforts to correct the conditions that were the basis for Alexis's removal within any nine-month period after the child was adjudicated as a neglected minor (*id.* § 1(m)(i)); and (3) that she failed to make reasonable progress toward the return of Alexis to her within any nine-month period after the child was adjudicated as neglected (*id.* § 1(m)(ii)).

¶ 41    The court held a permanency hearing on January 24, 2023. The State called one witness, and Jessica also testified.

¶ 42    Jordyn Hayes testified that she was previously employed with One Hope United as a case manager, and through that position she knew Jessica and Alexis. She stated that Jessica needed to cooperate with the agency, undergo mental health and substance abuse assessments/treatment, complete parenting classes, submit to weekly drug tests, and participate in visitation with Alexis. Hayes testified that she communicated these requirements to Jessica by text message at least five times. She stated that it was the responsibility of Jessica to locate these service providers, instigate services, and sign releases of information so that One Hope United could communicate with her providers. Jessica did not engage in any services while Hayes was her case manager. Between May 2022 and November 2022, Hayes requested weekly drug tests. In May 2022, after Jessica gave birth to another child, she had two drug tests, both of which were negative. After those two tests, Jessica never complied with the weekly drug testing requirements except for one excused week because Jessica established proof of having COVID-19.

¶ 43    Jessica testified that she had completed all services except parenting classes. She stated that she was in a hospital for 2½ weeks, and mental health was part of that hospitalization. She also stated that she had been in substance abuse treatment. She testified that she signed releases for all services received and that One Hope United should have those records. She testified that her most recent pregnancy made compliance with requested drug screens very difficult. Jessica confirmed that "at the start of her case," drug tests were positive, but stated that she had recently had several drug tests and they were all negative. She testified that she had been sober for almost two years.

¶ 44    At the conclusion of the permanency hearing, the trial court adopted the findings and recommendations advanced by DCFS. The court found that Jessica had not made reasonable and substantial efforts or progress toward the return of Alexis to her care. The court changed the

16

permanency goal to substitute care pending the court's determination of the State's petition to terminate Jessica's parental rights. The court set the fitness hearing for April 4, 2023.

¶ 45 On April 4, 2023, Jessica's attorney filed a motion to continue because Jessica had laryngitis. Jessica did not appear. The court granted the motion and set the fitness hearing for April 25, 2023.

¶ 46 On April 25, 2023, Hour House provided a letter to One Hope United that was filed with the court. Jessica was reported to have been admitted to the inpatient program on April 11, 2023, but left against staff advice on the morning of April 25, 2023.

¶ 47 On the date that Jessica was unsuccessfully discharged from Hour House, the court held the fitness hearing. The State called five former and current One Hope United employees to testify. Jessica also testified.

¶ 48 Elizabeth Shafer testified that she had been employed by One Hope United since 2019, except for the period between July 2020 and June 2021, when she was directly employed by DCFS. She was currently employed as a training specialist, and before July 2020, she had been employed as a placement worker. She was Jessica's caseworker for approximately six months. Shafer testified that during those six months, Jessica was required to engage in mental health, substance abuse, and parenting services and was required to submit to random drug tests, cooperate with DCFS, and engage in visitation with Alexis. Her communications with Jessica about the service plan were conducted in person, by phone, and by text messages. Jessica communicated her understanding of the service plan objectives with Shafer. Shafer testified that Jessica briefly engaged with an area mental health provider, but she never received any documentation of confirmation of treatment. Shafer spoke with that provider, who informed her that Jessica had engaged in one phone call with an employee, but that there was no follow-up, and no services were

17

provided. She stated that on two occasions Jessica was in residential substance abuse treatment, but that both times, she left treatment before services were completed. Otherwise, Shafer testified that she received no evidence of completion of substance abuse services, and Jessica never told her that she had completed services. Similarly, Shafer received no verbal or written documentation that Jessica had participated in parenting education. Regarding random drug tests, Shafer stated that tests were requested on a weekly basis, but Jessica would never participate. On one occasion, Jessica presented a document of a drug screen result, and Shafer contacted the provider who indicated that Jessica had not been drug tested by that provider. Shafer also testified that Jessica was provided with weekly visitation. On two occasions, Shafer supervised the visits, and testified that she had no concerns with Jessica's interactions with Alexis.

¶ 49    Kelly Dick testified that she had been employed by One Hope United as a placement worker from 2019 to January 2022, and was thereafter employed as a training specialist. Dick testified that she was Jessica's placement worker from July 2021 until January 2022. She stated that Jessica was hard to reach on most days, but she was able to contact her. Dick testified to the same service plan objectives that Shafer had referenced in her testimony. She believed that Jessica was also required to maintain clean affordable housing. During the time that Dick was assigned to Jessica's case, Jessica completed no services. She confirmed that Jessica had been admitted to inpatient substance abuse treatment at The Pavilion Behavioral Health System in Champaign (The Pavilion), but that she left against medical advice. Dick testified that at times when Jessica claimed to have COVID-19, those claims were false. She completed no services. Jessica claimed to have completed a parenting program with Family First but Dick stated that this was a community service program that did not meet DCFS requirements.

¶ 50    Dick testified that Jessica tagged One Hope United in a Facebook social media post, and listed Dick's name. In this post, Jessica stated that ALEXIS S. was being sexually molested and that she had completed all mandated services to have ALEXIS S. returned to her care. As a result of this post, One Hope United/DCFS required a detailed analysis of the case. Dick followed up by contacting the providers listed in Jessica's Facebook post and providing her superiors with investigative information about what Dick had and/or had not done in Jessica's case. In addition, One Hope United attempted to set up a child and family team meeting with Jessica, but she refused. Overall, Dick testified that Jessica left substance abuse treatment at The Pavilion before she completed the program and otherwise received no documentation that Jessica had engaged in any required services. Dick stated that she asked Jessica to submit to a random drug test every week she served on the case, but that Jessica completed no drug tests. Dick received documentation from the drug testing provider that Jessica did not show for the tests. She confirmed that Jessica was allowed weekly visitation with Alexis, but that her participation was "virtually nonexistent." When she did attend visits, Jessica's behavior was described as "kind of inappropriate." Jessica would make excuses for her lack of attendance, and Dick followed up with her providers learning that Jessica was fabricating the excuses. She testified that Jessica only exercised her visitation rights about once every two months.

¶ 51    On cross-examination, Dick stated that she attempted to meet with Jessica after a court hearing, but Jessica ran away. Additionally, she gave Dick five different phone numbers, and would never confirm which number was accurate, but would complain that Dick was "giving" her number out to strangers because she used all five telephone numbers in a group text to Jessica. Dick also testified that she confirmed that the uncle who reportedly had molested Jessica was never near or with Alexis.

¶ 52    Jordyn Hayes testified that she was then employed by Children's Home and Aid as an intact caseworker but was previously employed as a foster care case manager with One Hope United from February 2022 through November 2022. Hayes testified that she was familiar with Jessica and Alexis as she worked on their case between April 2022 and October 2022. During that time frame, Hayes testified that she had contact with Jessica multiple times each week, primarily through text messages. Hayes confirmed the same service plan objectives for Jessica and testified that she notified Jessica multiple times that the services, including parenting classes, were required. Jessica provided no documentation that she had engaged in any services. She stated that she had engaged in substance abuse services, but despite requests for releases of information, Hayes never received a signed release or any documentation that Jessica had received these services. Hayes stated that Jessica was scheduled for weekly random drug tests except for two excused weeks. On one of those excused weeks, Jessica claimed to have a contagious illness, and on the other week, she claimed that she was going to be receiving substance abuse services. Hayes testified that Jessica completed two drug tests with Occupational Health shortly after she was discharged from giving birth to another child. Otherwise, she did not participate in the drug tests. Hayes testified that DCFS policy is to construe any failure to appear for a drug test as a failed drug test. She also testified that Jessica was offered weekly visitation, and she supervised two of these visits. At one of the visits, Alexis reported to Hayes that she was uncomfortable with some of the things that Jessica was saying to her. After some time, Alexis refused to get into the transport vehicle to have additional visitation opportunities with Jessica. Hayes explained that visitation is never forced upon the child.

¶ 53    On cross-examination Hayes testified that Alexis began refusing visitation with Jessica in September 2022, and that Alexis's stated reason for refusing visitation was because her mother

was lying to her. Hayes confirmed that Jessica asked her for assistance in setting up mental health and substance abuse services but stated that it was difficult to provide Jessica with guidance "because Jessica was very combative in the text messages."

¶ 54 Katie Alexander next testified that she had been employed with One Hope United for approximately four years as a family support specialist, who facilitates and supervises visitation between parents and their children. She had worked with Jessica and Alexis since 2020. The State asked Alexander to testify about the nine-month period between September 4, 2021, and August 4, 2022. During that time frame, Jessica's visits were "very scarce," and Alexander testified that during that specific time there was a six-month period with no visitation exercised by, and/or communication with, Jessica. Alexander stated that Jessica signed confirmation agreements that mandated Jessica's confirmation with the agency the day before each visit. Confirmation was allowed by any form of communication.

¶ 55 On cross-examination, Alexander acknowledged that Jessica wanted the visits to take place Paris instead of Marshall. However, Alexander testified that the agency typically holds the visits in the city where the child attends school to keep the children from having to commute longer distances. While the agency was not able to accommodate Jessica's location requests, Alexander stated that they provided Jessica with gasoline cards and bus passes to facilitate her transportation.

¶ 56 The State also called Janessa Watson, who testified that she was employed by One Hope United as a caseworker and had been involved with this case since October 2022. She testified that Jessica still needed to complete services for substance abuse (including random drug tests), mental health, and parenting. Jessica was also required to cooperate with the agency and to engage in visitation with Alexis. Watson confirmed that she had informed Jessica of the need to complete these service tasks but stated that she had not received any documentation that Jessica had done

21

so. While there were a couple of weeks that Watson opted not to send Jessica to take a drug test because of weather conditions, and more recently when Jessica went to Hour House for substance abuse treatment, Watson testified that she otherwise required weekly tests. Jessica completed only one test in March 2023.[5] In response to all other requests, Jessica made excuses including being sick "a lot," and otherwise refusing to take the tests.

¶ 57     Jessica testified next on her own behalf. She testified that visits with Alexis were held in Marshall, Paris, and Charleston. She testified that she repeatedly requested that the visits be held in Paris where she lived because of transportation issues, and more recently because of her pregnancy. She testified that she repeatedly called and texted One Hope United about the visits. Jessica testified that she had tried to get assistance from One Hope United with her parenting class service requirement. Regarding mental health services, she testified that she was twice admitted to a mental health ward at a Terre Haute, Indiana, hospital, and that with both admissions, she underwent a mental health assessment. She testified that she had repeatedly attempted to obtain substance abuse treatment. In July 2021, she successfully detoxed at The Pavilion for 10 days, but was discharged because the facility had no open beds for continued treatment. Most recently, she went to Hour House for treatment, but left to prepare for this court hearing. She testified that at the conclusion of the hearing, she would be checking herself back into rehabilitation services at Hour House. Jessica testified that her communication with One Hope United was sporadic and stated that she had cell phone issues that limited the minutes she could use with her cell phone plan. She also testified that due to a spider bite, she repeatedly gets bacterial infections—Methicillin-resistant Staphylococcus aureus. While her infections are active, she is not allowed to be around the children. However, she testified that her physician's notes that she was "released" to be around

---

[5]Watson was not asked and did not testify about the results of this drug test.

her children was not specific enough for One Hope United. Jessica also testified that she telephoned the Human Resources Center of Edgar and Clark Counties (HRC) in Paris to have a substance abuse assessment. Jessica stated that HRC did not recommend that she engage in any treatment. She testified that she signed a release to have the information sent to One Hope United. She also testified that after her son was born in May 2022, she had four successive negative drug tests.

¶ 58    On cross-examination, Jessica confirmed that her last visit with Alexis was during the fall of 2022. She also stated that she signed releases at the unnamed Terre Haute, Indiana, hospital so that One Hope United would receive her mental health assessments. She testified that she informed her caseworker about this assessment but could not recall which caseworker she had at that time. Jessica stated that she went to The Pavilion for detox from methamphetamine in July 2021. She stated that she had been using methamphetamine for six months before she went into detox.

¶ 59    Kelly Dick was recalled by the State and confirmed that she was Jessica's caseworker in December 2021. She testified that she received no documentation that Jessica had engaged in inpatient mental health treatment that month.

¶ 60    At the conclusion of the fitness hearing, the trial court verbally stated "that the State has met their burden with respect to each of the three allegations regarding [Jessica]." The court then proceeded with the best interest hearing.

¶ 61    The State called Janessa Watson to testify, who again testified that she was the current caseworker, and was familiar with the foster parents of Alexis, having met with them once or twice each month. The household makeup includes the two foster parents, Alexis, her younger brother Kaiden H., and a foster sibling. Alexis has her own bedroom. Alexis has no health concerns and is currently enrolled in school. Watson testified that she had witnessed interactions between Alexis

23

and her foster parents and she had no concerns. The foster parents are employed. They have moved once since Watson was assigned to the case and have plans to move again to a bigger home so Kaiden can have his own bedroom. Alexis is loving and open with her foster parents. On cross-examination, Watson testified that the foster parents were required to undergo a background check, as well as a licensing process.

¶ 62    Jessica's attorney called Kelly Dick to testify. Dick testified that she participated in the background inquiry of the foster parents. She confirmed that there was a battery charge and an order of protection involving an individual named Sabrina W.[6] The incident was more than 10 years old and was addressed by the agency.

¶ 63    At the conclusion of the best interest hearing, the trial court made its finding that the State met its burden of proof in establishing that it was in Alexis's best interest for Jessica's parental rights to be terminated.

¶ 64    On May 24, 2023, Jessica filed a motion to reconsider alleging that the adjudicatory hearing was not conducted within 90 days after the State filed its petition for adjudication of wardship on May 26, 2020. Jessica argued that the trial court should have dismissed the case without prejudice on August 24, 2020. She acknowledged that she sought a continuance on September 22, 2020, but argued that because the case was already past the 90-day requirement, her continuance request was inconsequential. Ultimately, Alexis was not adjudicated as a ward of the State until April 6, 2021. Additionally, Jessica contended that the State failed to prove the allegations at the adjudicatory, fitness, and best interest hearings according to the relevant standards.

¶ 65    On August 1, 2023, after a hearing, the trial denied Jessica's motion to reconsider.

---

[6]The record is unclear whether Sabrina W. is one of the foster parents and/or had been involved in the battery charge.

¶ 66                                II. ANALYSIS

¶ 67    Jessica appeals from the trial court's orders finding that she was an unfit parent and terminating her parental rights. Before we reach these two orders, we must initially determine if the adjudicatory order must be vacated without prejudice because it was held past the mandatory statutory timeframe.

¶ 68                          A. Appeal of Adjudicatory Order

¶ 69    Also, we also find that this court lacks jurisdiction to address this issue as the adjudicatory order is one step in the process and is not appealable on its own. *In re D.R.*, 354 Ill. App. 3d 468, 473 (2004). The dispositional order that follows the adjudicatory order is the appealable order. *In re M.J.*, 314 Ill. App. 3d 649, 655 (2000). At the first step, the adjudicatory hearing, the trial court must determine if the minor is abused, neglected, or dependent. 705 ILCS 405/2-21(1) (West 2020). Placement of the minor is then determined by the subsequent dispositional order. *In re D.R.*, 354 Ill. App. 3d at 473. The dispositional order is the final and appealable order—not the adjudicatory order. *In re M.J.*, 314 Ill. App. 3d at 655.

¶ 70    All appeals from final orders entered pursuant to the Juvenile Court Act of 1987, except for delinquency orders, are subject to the rules that apply to civil cases. Ill. S. Ct. R. 660(b) (eff. Oct. 1, 2001). Thus, Jessica was required to file a notice of appeal from the dispositional order within 30 days after it was entered—within 30 days of May 24, 2022. Ill. S. Ct. R. 303(a)(1) (eff. July 1, 2017). As Jessica did not timely file her notice of appeal in this case, we do not have jurisdiction over the issue she raises on appeal directed to the timeliness of the adjudicatory order.

¶ 71                          B. Termination of Parental Rights

¶ 72    The Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 2020)) and the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2020)) provide the legal authority for the involuntary

25

termination of parental rights in Illinois. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 30 (citing *In re J.L.*, 236 Ill. 2d 329, 337 (2010)). Section 2-29(2) of the Juvenile Court Act of 1987 provides the procedural basis for the involuntary termination of parental rights. 705 ILCS 405/2-29(2) (West 2020). The process mandated involves two hearings. In the first hearing, the State must prove by clear and convincing evidence that the parent is an "unfit person" as defined by the Adoption Act. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 30 (citing *In re A.J.*, 269 Ill. App. 3d 824, 828 (1994)); 750 ILCS 50/1(D) (West 2020). If the trial court finds that the parent is unfit, the case proceeds to a second hearing where the State must prove, by a preponderance of the evidence, that it is in the child's best interest that the parent's rights be terminated. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 30 (citing *In re J.L.*, 236 Ill. 2d 329, 337-38 (2010)); 705 ILCS 405/2-29(2) (West 2020).

¶ 73    When a parent appeals the trial court's findings that a parent is unfit and that terminating the parental rights is in the child's best interest, the appellate court must not retry the case but, instead, must review the trial court's findings to determine if the findings are against the manifest weight of the evidence. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31 (citing *In re A.W.*, 231 Ill. 2d 92, 104 (2008)). The reviewing court gives great deference to the trial court's finding of unfitness because the court had the best opportunity to view and evaluate the parties and their testimony. *Id.* (citing *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006)). Therefore, we do not reweigh the evidence or reassess the credibility of the witnesses on appeal. *Id.* (citing *In re M.A.*, 325 Ill. App. 3d 387, 391 (2001)). "A decision is contrary to the manifest weight of the evidence if the opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on the evidence presented." *Id.* (citing *In re Vanessa K.*, 2011 IL App (3d) 100545, ¶ 28).

¶ 74                                     C. Fitness

¶ 75    We first review the evidence to determine if the State met its burden of proving, by clear and convincing evidence, that Jessica was an "unfit person." The trial court determined that the State met its burden of proof on the following bases: (1) that Jessica failed to maintain a reasonable degree of interest, concern, or responsibility as to Alexis's welfare (750 ILCS 50/1(D)(b) (West 2020)); (2) that Jessica failed to make reasonable efforts to correct the conditions that were the basis for Alexis's removal during any nine-month period after the adjudication of neglect (*id.* § 1(D)(m)(i)); and (3) that Jessica failed to make reasonable progress toward Alexis's return within any nine-month period following the adjudication of neglect (*id.* § 1(D)(m)(ii)).

¶ 76              1. *Reasonable Degree of Interest, Concern, or Responsibility*

¶ 77    The language used by our legislature in section 1(D)(b) of the Adoption Act is in the disjunctive, meaning that any one of the three separate segments—interest or concern or responsibility—"may be considered by itself as a basis for unfitness." *In re B'yata I.*, 2014 IL App (2d) 130558-B, ¶ 31 (citing 750 ILCS 50/1(D)(b) (West 2012); *In re Richard H.*, 376 Ill. App. 3d 162, 166 (2007)). To determine if a parent has shown a reasonable degree of interest, concern, or responsibility for a minor's welfare, the court "considers the parent's efforts to visit and maintain contact with the child as well as other indicia, such as inquiries into the child's welfare." *Id.* (citing *In re Daphnie E.*, 368 Ill. App. 3d at 1064). The court can also consider evidence that the parent completed her or his service plan as establishing the parent's interest, concern, or responsibility. *Id.* (citing *In re Daphnie E.*, 368 Ill. App. 3d at 1065). A parent's effort is more important than a parent's success with the service plan objectives. *Id.* (citing *In re Adoption of Syck*, 138 Ill. 2d 255, 279 (1990)). The court must "examine the parent's conduct concerning the child in the context of the circumstances in which that conduct occurred." *Id.* (citing *In re Adoption of Syck*, 138 Ill. 2d

27

at 278). Circumstances of the parent's difficulties in completion of plan objectives and/or in attending visitation, including transportation issues and poverty, are relevant in assessing the reasonable degree of a parent's interest, concern, or responsibility for the minor's welfare. *Id.* (citing *In re Adoption of Syck*, 138 Ill. 2d at 278-79). "We are mindful, however, that a parent is not fit merely because he or she has demonstrated some interest or affection toward the child." *Id.* (citing *In re Jaron Z.*, 348 Ill. App. 3d 239, 259 (2004)). Instead, the court must objectively assess whether the interest, concern, or responsibility is reasonable. *Id.* (citing *In re Daphnie E.*, 368 Ill. App. 3d at 1064).

¶ 78    Here, the trial court concluded that Jessica failed to show interest, concern, and/or responsibility toward Alexis's return. We turn to the service plan objectives and visitation to assist in evaluating whether the trial court's conclusion was in error. *In re Richard H.*, 376 Ill. App. 3d at 166.

¶ 79    Jessica never completed any of her service plan objectives: substance abuse treatment, individual mental health therapy, and parenting classes and coaching. She was noncompliant with mandated weekly drug tests and also inconsistent with visitation.

¶ 80    Jessica started the detox process from methamphetamines more than once and failed to complete this task. In addition, throughout this case, Jessica was required to submit to weekly drug testing. With exceptions for illnesses and detoxing at a substance abuse treatment facility, Jessica missed virtually all required tests. From testimony at the hearing, DCFS construes a missed test as a failed test. We acknowledge that shortly after Jessica gave birth to a child, Kaiden H., in May 2022, there were a few negative tests, but she failed to participate in weekly drug tests thereafter. Overall, Jessica was noncompliant with substance abuse services and mandated testing.

28

¶ 81    In addition, Jessica never initiated mental health therapy. While she apparently checked herself into a mental health unit at a hospital and claims that she underwent "assessments" at that hospital, One Hope United never received them.

¶ 82    Jessica completed a community-based parenting program but did not confirm that the program would satisfy her service plan objective with One Hope United, and the program Jessica attended was not the type required by DCFS. In addition, Jessica did not receive parenting coaching as required. Finally, Jessica was inconsistent with supervised visitation, and toward the end of this case, there were no visits because Alexis refused them.

¶ 83    We must give great deference to the trial court's finding of unfitness as the court was able to evaluate the demeanor and testimony of Jessica and the five current and former One Hope United employees. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31 (citing *In re Daphnie E.*, 368 Ill. App. 3d at 1064). Overall, we agree with the trial court's findings that the evidence clearly established that Jessica failed to maintain a reasonable degree of interest, concern, and/or responsibility for Alexis. Jessica's failure to engage or complete the required service plan objectives demonstrated her lack of interest, concern, or responsibility for Alexis. *In re Daphnie E.*, 368 Ill. App. 3d at 1065. We find that the trial court's finding is not contrary to the manifest weight of the evidence. *In re M.I.*, 2016 IL 120232, ¶ 21; *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31 (citing *In re A.W.*, 231 Ill. 2d at 104).

¶ 84             2. *Reasonable Effort Within Any Nine-Month Period*

¶ 85    "Reasonable effort" is determined by a subjective standard that refers to the amount of effort which is reasonable for that parent. *In re Daphnie E.*, 368 Ill. App. 3d at 1066-67. The court must determine whether the parent has made committed and diligent efforts toward correcting the conditions that led to the removal of the minor from the home. *In re L.J.S.*, 2018 IL App (3d)

180218, ¶ 24. "A parent's deficiencies collateral to the conditions that were the basis for the removal of the children are not relevant to the reasonable efforts analysis." *In re D.F.*, 332 Ill. App. 3d 112, 125 (2002).

¶ 86    Alexis was removed from Jessica's care because of an environment that was potentially injurious to her health. Jessica's apartment was extremely dirty and contaminated with insects. Cigarette butts were accessible to the children. There had also been reports that Jessica allowed Alexis to be outside of the apartment on an unsupervised basis. Additionally, Alexis's younger brother had unexplained burns, bruises, a leg fracture, and a diagnosis of failure to thrive. Jessica also abused methamphetamine. She completed no services and remained combative with One Hope United staff throughout the duration of this case. Jessica did not engage in any service plan objectives, and thus did not make "a committed and diligent effort" to correct the underlying conditions. *In re L.J.S.*, 2018 IL App (3d) 180218, ¶ 24. We find that the trial court's order finding that Jessica failed to show a reasonable effort toward correcting these conditions is not contrary to the manifest weight of the evidence. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31 (citing *In re Vanessa K.*, 2011 IL App (3d) 100545, ¶ 28).

¶ 87             3. *Reasonable Progress Within a Nine-Month Period*

¶ 88    The term "reasonable progress" requires an objective determination regarding the amount of progress based upon the conditions existing at the time the minor child's custody was removed from the parent. *Id.* ¶ 47 (citing *In re D.T.*, 2017 IL App (3d) 170120, ¶ 17).

> " 'The benchmark for measuring a parent's reasonable progress under section 1(D)(m)
> of the Adoption Act encompasses the parent's compliance with the service plans and
> court's directives in light of the condition that gave rise to the removal of the child and

30

other conditions which later become known that would prevent the court from returning custody of the child to the parent.' " *Id.* (*In re D.T.*, 2017 IL App (3d) 170120, ¶ 17). "A parent makes reasonable progress when the trial court can find that the progress 'is sufficiently demonstrable and of such a quality' that the trial court may soon be able to order the return of the minor to the parent's custody." *Id.* (*In re D.T.*, 2017 IL App (3d) 170120, ¶ 17).

¶ 89     Here, the trial court found that Jessica failed to make reasonable progress during any nine-month period following the court's adjudication of neglect. During the three years that Jessica's DCFS case was open, she failed to complete her substance abuse, mental health, and parenting service plan objectives. We agree with the trial court's finding that Jessica objectively failed to make reasonable progress to correct the conditions that were the basis for the removal of Alexis during any nine-month period. We conclude that the trial court's order finding that Jessica was an unfit parent is not contrary to the manifest weight of the evidence. *Id.* ¶ 30 (citing *In re A.J.*, 269 Ill. App. 3d at 828).

¶ 90                                   D. Best Interest

¶ 91     Termination of a parent's rights is a difficult and final step. *In re Adoption of Syck*, 138 Ill. 2d at 274-75. Parents maintain the important right to raise their own children. *Id.* However, when a parent has been declared "unfit," "the parent's rights must yield to the child's best interest." *In re Tashika F.*, 333 Ill. App. 3d 165, 170 (2002); *In re J.L.*, 236 Ill. 2d 329, 337-38 (2010). The interests of the parent and the child remain concurrent "to the extent that they both 'share a vital interest in preventing erroneous termination of their natural relationship' " until the court declares that the parent is unfit. *In re D.T.*, 212 Ill. 2d 347, 363 (2004) (quoting *Santosky v. Kramer*, 455 U.S. 745, 760-61 (1982)).

¶ 92    At the best interest hearing, the State must establish proof that termination of a parent's

rights is in the child's best interest by a preponderance of the evidence. 705 ILCS 405/2-29(2)

(West 2020); *In re D.T.*, 212 Ill. 2d 347, 366 (2004). We review the trial court's best-interest

decision with the manifest weight of the evidence standard. *In re Jay. H.*, 395 Ill. App. 3d 1063,

1071 (2009); *In re S.J.*, 368 Ill. App. 3d 749, 755 (2006). "A best-interest determination is against

the manifest weight of the evidence only if the facts clearly demonstrate that the court should have

reached the opposite result." *In re Daphnie E.*, 368 Ill. App. 3d at 1072. On appeal from an order

terminating a parent's rights, the reviewing court gives great deference to the trial court's decision

because the trial court was in a much better position to see the witnesses and judge their credibility.

*In re K.B.*, 314 Ill. App. 3d 739, 748 (2000).

¶ 93    "[A]t a best-interests hearing, the parent's interest in maintaining the parent-child

relationship must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d

at 364. The trial court must analyze several factors within "the context of the child's age and

developmental needs" when considering if termination of parental rights serves a child's best

interest. 705 ILCS 405/1-3(4.05) (West 2020). Those factors include:

> "(a) the physical safety and welfare of the child, including food, shelter, health, and
>
> clothing;
>
> (b) the development of the child's identity;
>
> (c) the child's background and ties, including familial, cultural, and religious;
>
> (d) the child's sense of attachments, including:
>
>> (i) where the child actually feels love, attachment, and a sense of being
>>
>> valued (as opposed to where adults believe the child should feel such love,
>>
>> attachment, and a sense of being valued);

32

(ii) the child's sense of security;

(iii) the child's sense of familiarity;

(iv) continuity of affection for the child;

(v) the least disruptive placement alternative for the child;

(e) the child's wishes and long-term goals;

(f) the child's community ties, including church, school, and friends;

(g) the child's need for permanence which includes the child's need for stability

and continuity of relationships with parent figures and with siblings and other relatives;

(h) the uniqueness of every family and child;

(i) the risks attendant to entering and being in substitute care; and

(j) the preferences of the persons available to care for the child." *Id.*

The trial court is not required to make an explicit finding on each of the best interest factors. *In re Ca. B.*, 2019 IL App (1st) 181024, ¶ 33 (citing *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19); *In re Custody of G.L.*, 2017 IL App (1st) 163171, ¶ 43 (citing *In re Marriage of Diehl*, 221 Ill. App. 3d 410, 424 (1991)). Another factor the trial court may consider is the likelihood of adoption. *In re Tashika F.*, 333 Ill. App. 3d at 170.

¶ 94    During the best interest hearing, One Hope United caseworker Janessa Watson testified that Alexis had no health concerns and was enrolled in school. She described interactions between Alexis and her foster parents and stated that she had no concerns with Alexis in this foster parent setting. Alexis had her own bedroom, and was currently placed with her infant biological half-brother, Kaiden H., and another child. Alexis's relationship with her foster parents was reported as loving and open.

33

¶ 95    Here, the record clearly establishes that termination of Jessica's parental rights was the appropriate outcome for Alexis under all the circumstances. We conclude that the trial court's decision to terminate Jessica's parental rights was not contrary to the manifest weight of the evidence. *In re D.F.*, 201 Ill. 2d 476, 498-99 (2002).

¶ 96                              III. CONCLUSION

¶ 97    For the foregoing reasons, we affirm the judgments of the circuit court of Edgar County finding that Jessica was an unfit parent, and that the best interest of Alexis required the termination of her parental rights.

¶ 98    Affirmed.